IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
(SHREVEPORT DIVISION)

**GRESHUN DE BOUSE,**
Plaintiff,

5:26-cv-2829

V.

**Case No.:**______________
*(To be assigned by the Clerk)*

**LIBERTY UNIVERSITY, INC.,**
Defendant.

**COMPLAINT FOR CIVIL RIGHTS RETALIATION, FRAUDULENT MISREPRESENTATION, AND BREACH OF CONTRACT**

**DEMAND FOR JURY TRIAL**

Plaintiff Greshun De Bouse, appearing pro se, respectfully files this Complaint against Defendant Liberty University, Inc., seeking maximum compensatory, restitutionary, and punitive financial judgments allowed by law. The baseline of this action rests upon a continuous, 15-year deceptive consumer schema orchestrated by Defendant from Fall 2011 to the Present to systematically execute predatory financial aid bait-and-switch operations, pre-semester funding purges, and parallel ledger falsifications. Defendant aggressively escalated this financial fraud into a targeted civil rights containment campaign to intentionally suppress Plaintiff's copyrighted qualitative research and concurrent sexual violence (SV) report filings. Both actions unmasked the precise systemic institutional failures for which Defendant was investigated and fined in 2024 by the U.S. Department of Education under **20 U.S.C. Section 1092(f)**. To achieve this total research suppression and insulate the institution from public liability, Defendant deployed a coordinated sequence of retaliatory institutional maneuvers: a bad-faith failure to accommodate and reneging on established disability modifications under **29 U.S.C. Section 794**; utilizing

faculty agents to coerce Plaintiff into altering Plaintiff's research area under **La. C.C. art. 2315**; and weaponizing fabricated, unsubstantiated artificial intelligence (AI) academic integrity violations into permanent institutional networks under **15 U.S.C. Section 45**. Defendant deliberately utilized fraudulent AI allegations and synchronized administrative sanctions as containment mechanisms of choice to manufacture grounds for academic dismissal, permanently discredit Plaintiff's scholarly credibility, and ensure both Plaintiff's empirical findings in institutional contributions to female SV survivor trauma outcomes, and Plaintiff's personal SV occurrence reported to Defendant would be discounted. Plaintiff resisted this institutional censorship by formally reporting Defendant's misconduct to the Office for Civil Rights (OCR) on July 13, 2026. As a direct consequence of Defendant's conduct, Plaintiff has sustained profound, permanent institutional trauma, severe financial deprivation, and the complete destruction of a professional legal trajectory, collectively inducing academiphobia, post-traumatic stress disorder (PTSD), and traumatic night terrors, giving rise to maximum damage liabilities under **La. C.C. art. 2315** and **La. C.C. art. 1997**. Plaintiff discovered the operational totality and hidden magnitude of this multi-tiered financial and reputational deception on July 27, 2026. Plaintiff respectfully shows this Court as follows

**JURISDICTION AND VENUE**

1. This Court possesses federal question subject-matter jurisdiction over this action pursuant to **28 U.S.C. Section 1331**, as Plaintiff's primary civil rights and research suppression claims arise directly under **Title III and Title V of the Americans with Disabilities Act, 42 U.S.C. Sections 12181, 12203,** and **Section 504 of the Rehabilitation Act, 29 U.S.C. Section 794.**

2. This Court possesses supplemental jurisdiction over the Plaintiff's state-law claims for Fraudulent Misrepresentation, Breach of Contract, Unfair Trade Practices, and Corporate Defamation Per Se pursuant to **28 U.S.C. Section 1367**, as these claims arise from a common nucleus of operative fact with the primary federal statutory claims.
3. This Court possesses independent, concurrent subject-matter jurisdiction over this entire action pursuant to **28 U.S.C. Section 1332** (Diversity of Citizenship Jurisdiction). Plaintiff is a citizen of Louisiana, Defendant is an out-of-state corporation with its principal place of business in Lynchburg, Virginia, and the aggregate amount-in-controversy exponentially exceeds the $75,000.00 statutory threshold. Plaintiff seeks compensatory, restitutionary, and statutory damages in the definitive amount of $15,000,000.00 for a continuous 15-year campaign of corporate financial exploitation, pre-semester bait-and-switch packaging schemes, and targeted programmatic stalling engineered to suppress Plaintiff's scholastic operations. Plaintiff further seeks general tort damages for corporate defamation per se, intentional research suppression, severe emotional duress, physical strain, clinical trauma, and catastrophic public professional degradation in the definitive amount of $35,000,000.00, exclusive of interest and costs, totaling a collective structural claim of $50,000,000.00. This multi-tiered operational injury directly flows from a coordinated institutional campaign to target and censor Plaintiff's independent, federally copyrighted qualitative research that mirrors charges for which Defendant was fined in 2024, utilizing a weaponized denial of mandatory disability accommodations as a tactical vector to deliberately disrupt Plaintiff's advanced legal and academic research track completion ability.

4. Venue is proper in the United States District Court for the Western District of Louisiana, Shreveport Division, pursuant to 28 U.S.C. Section 1391(b)(2), because a substantial part of the events, omissions, and operational impacts giving rise to these claims materialized while Plaintiff resided and executed online academic duties within this judicial district. This includes the localized materialization of financial injuries from the continuous 15-year packaging manipulation, the domestic execution and localized server transactions of Plaintiff's independent qualitative research track, and targeted technical suppression of Plaintiff's digital accommodations which directly obstructed Plaintiff's research completion capacity within this district

## I. PARTIES

5. Plaintiff, Greshun De Bouse, is an individual residing in Shreveport, Louisiana, who was at all relevant times continuously enrolled as a Doctor of Law and Policy student at Liberty University.

6. Plaintiff is a qualified individual with visual and mobility disabilities under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, requiring wheelchair and specific auxiliary screen-reading technologies utilization, including Google Lookout and Google TalkBack software, to read, write, and execute doctoral-level academic text submissions.

7. Defendant, Liberty University, Inc., is a private, non-profit institution of higher education receiving federal financial assistance, organized under the laws of Virginia, with its principal place of business located at 1971 University Boulevard, Lynchburg, Virginia 24515.

## II. STATEMENT OF FACTS

The numbered factual sequences set forth below document an egregious, continuous 15-year campaign of targeted corporate fraud, civil rights violations, and predatory financial exploitation perpetrated by Defendant Liberty University, Inc., through its designated administrators, financial processors, and Faculty Agents against Plaintiff spanning from Fall 2011 through the Present. The active electronic server logs, database transactions, and communication strings expose a unified corporate schema engineered to execute two distinct phases of targeted institutional exploitation: First, from Fall 2011 through the Present, Defendant executed a continuous, multi-year pattern of consumer fraud by publishing high-value federal aid packages to secure Plaintiff's enrollment contracts, only to execute unauthorized pre-semester under-award ledger reductions to strip away vital auxiliary and operational resources before classes commenced. Second, from 2022 onward, Defendant's conduct expanded into a severe, targeted campaign of administrative research suppression, academic censorship, and corporate defamation per se, which escalated into explicit, bad-faith statutory crimes against a disabled person from 2023 onward, following the onset of Plaintiff's qualifying visual impairment. Defendant weaponized technical pretexts to suppress and criminalize the automated vocalization footprints of Plaintiff's digital screen-reading software, transforming mandatory accommodations into administrative liabilities to induce academic duress, extract extortionate tuition, and enforce compliance. Concurrently, Defendant unleashed a targeted campaign to censor and suppress Plaintiff's independent, qualitative Dissertation research on female male-perpetrated sexual violence survivor outcomes, a research area Defendant was aware of since September 2022.

Unbeknownst to Plaintiff, Plaintiff's Dissertation research and findings on institutional contributions to female SV survivor trauma paralleled the timing of, and mirrored the charges for which Defendant was investigated beginning 2022, and fined in 2024. To discredit and hinder Plaintiff's research completion, publication, and university violation exposure and reporting, Defendant executed an aggressive retaliation campaign from 2022 to 2026, via false artificial intelligence (AI) infraction manufacturing, and weaponized plagiarism accusations to permanently discredit and suppress Plaintiff's findings and reporting of institutional violations. Plaintiff discovered the full operational totality and hidden magnitude of this multi-tiered financial and reputational deception on July 27, 2026. Plaintiff respectfully shows this Court as follows: First, from Fall 2011 through the Present, Defendant executed a continuous, multi-year pattern of consumer fraud by publishing high-value federal aid packages to secure Plaintiff's enrollment contracts, only to execute unauthorized pre-semester under-award ledger reductions to strip away vital auxiliary and operational resources before classes commenced. Second, from 2023 onward—the era in which Plaintiff became disabled—Defendant's conduct transitioned into a severe, targeted campaign of administrative crimes against a disabled person under La. C.C. art. 2315 and 29 U.S.C. Section 794. Defendant weaponized technical pretexts to suppress and criminalize the automated vocalization footprints of Plaintiff's necessary digital screen-reading software, transforming mandatory accommodations into administrative liabilities to induce academic duress, extract extortionate tuition, and enforce compliance. This hostile schema culminated on July 17, 2026, with an unauthorized database override to execute a fraudulent retroactive withdrawal flag to claw back an approved $41,064.00 Graduate PLUS Loan allocation, while concurrently enforcing internal tuition check-in demands on parallel ledgers on July 25, 2026, and July 26, 2026.

8. On February 1, 2024, Defendant, through its Agent, executed calculated institutional pressure to coerce Plaintiff into abandoning the sensitive research area. Defendant applied this administrative pressure in tandem with the U.S. Department of Education's final Clery Act review, with full corporate awareness that allowing an uncompromised qualitative study by Plaintiff detailing institutional cover-ups to be published in its databases and elsewhere would create catastrophic regional data correlation and public regulatory exposure.
9. On March 5, 2024, the U.S. Department of Education executed a final settlement and federal fine against Defendant Liberty University, Inc., finding the institution guilty of systemic, long-term Clery Act violations, including the active suppression of sexual assault reports and the systematic penalization of female victims who stepped forward—an exact component of Plaintiff's research.
10. In mid-2024, Defendant's Academic Agents continued a targeted containment campaign to intercept and block critical components of Plaintiff's research regarding domestic police department contributions to female SV survivor trauma outcomes. This attempt to isolate Plaintiff's study coincides with Defendant's active federal liabilities.
11. Spanning from July 2024 through December 2025, Defendant executed a systematic campaign of administrative steering, bad-faith review freezes, and purposeful milestone stagnation across multiple sequential enrollment tracks to extract unnecessary, unauthorized tuition fee assessments. Following Plaintiff's protected internal financial disclosures in July 2024, Defendant intentionally subjected Plaintiff's academic profile to a continuous cycle of disruptive chair changes from late August 2024 through September 2024, unauthorized procedural hurdles, and bad-faith academic interference, utilizing

unvetted Faculty Agents with documented criminal records to oversee and compromise Plaintiff's sensitive, proprietary qualitative data files in material breach of the educational contract under **La. C.C. art. 1997.** These faculty reassignments injected personal conflicts of interest, enforced arbitrary administrative steering, and imposed unauthorized procedural hurdles on Plaintiff's degree track in material breach of the educational contract under **La. C.C. art. 1997**.

12. Consistently, when Plaintiff exposed and reported university violations, Defendant executed aggressive retaliation campaigns spanning 2022 to 2026, usually in the form of false academic misconduct allegations. These containment campaigns escalated immediately on February 12, 2025, upon Defendant's realization that Plaintiff's research focus would remain on the area of institutional female SV reporting obfuscation for which Defendant was investigated and penalized by the U.S. Department of Education, and in response to Plaintiff formally challenging Defendant's Dissertation Chair Agent for reneging on an off-video Dissertation accommodation. Defendant launched an aggressive administrative credibility smear campaign against Plaintiff, consisting of systematically and fraudulently deploying fabricated academic misconduct AI allegations and weaponizing financial interventions to divest Plaintiff of legacy PLUS Loan status, and permanently discredit, suppress, and physically obstruct Plaintiff's research completion, data dissemination, and reporting of institutional violations under **15 U.S.C. Section 45.**

13. Additionally, on February 12, 2025, utilizing the fraudulent AI allegations, Defendant through its Dissertation Chair Agent, abruptly canceled Plaintiff's scheduled Dissertation Proposal milestone. This retaliatory action was supported by Defendant's Dissertation

Reader Agent—who unbeknownst to Plaintiff at the time, dually operated as the Director of Doctoral Research, has a 20-year institutional tenure, and simultaneously operated outside the university as a corporate Chief Data Officer and Co-Founder specializing in database architecture and implementation tracking methodology design. Such technical background could enable one to manufacture false AI documents within a database. Though Defendant's Dissertation Reader Agent admittedly could neither substantiate AI usage nor provide Plaintiff with requested alleged AI findings to date, Defendant still utilized this dual-ledger administrative authority of its Dissertation Reader Agent as a multi-tiered delay technique and predatory financial ploy to extract tuition for additional unnecessary semesters for Dissertation completion, while manufacturing a pretextual misconduct violation to suppress, censor, and discredit Plaintiff's sensitive qualitative data under **15 U.S.C. Section 45.**

14. Spurred by this defensive necessity to shield digital tools from institutional bias, Plaintiff applied for disability protections and transmitted required medical documentation to Defendant's Office of Disability Accommodation Support (ODAS) on February 13, 2025. When Plaintiff formally applied for such protections, Defendant's Office of Disability Accommodation Support (ODAS) executed a multi-month campaign of deliberate review freezes and falsified record-retention pretexts to systematically deny Plaintiff's required reading modifications, constituting an active, hostile failure to accommodate and targeted programmatic retaliation under Section 504 of the Rehabilitation Act **(29 U.S.C. Section 794).**

15. On February 14, 2025, Defendant officially assigned Plaintiff's accommodation file to an Accessibility Agent who permitted an initial 20-day administrative gap to pass with no

accommodations issued, forcing Plaintiff to file a formal grievance on March 4, 2025. Defendant systematically neglected this filing for an additional 44 days, and on April 16, 2025, Defendant's Accessibility Agent attempted to cover administrative tracks via email by falsely claiming the same medical documentation confirmed two months prior was not received. This stall tactic is completely refuted by Defendant's own Agent confirmation of sufficient disability-supported medical documentation, and by subsequent database records from Defendant's secondary Accessibility Agent on June 19, 2025, explicitly thanking Plaintiff for sufficient documentation assets under **34 C.F.R. Section 104.44.**

16. On March 9, 2025, four days after Defendant was heavily fined by federal regulators under **20 U.S.C. Section 1092(f)**, and five days after Plaintiff filed the formal internal grievance for accommodation violations, the research suppression and bad-faith data containment campaign accelerated. As documented in Plaintiff's permanent electronic Dissertation manuscript review logs, Defendant's Director of Doctoral Research Agent—with a 20-year institutional tenure, who simultaneously operated outside the university as a corporate Chief Data Officer and Co-Founder specializing in database architecture and implementation tracking methodology design—targeted Plaintiff's empirical data on institutional betrayal (IB). In response to Plaintiff's Dissertation research text quoting Gena Dufour: "Dufour (2024) emphasizes the concept of institutional betrayal (IB), marked by institutional action or inaction that inflicts additional harm on female SV survivors, as a chief culprit of exacerbated female survivor trauma experience (p. 3904)," Defendant's Director of Doctoral Research Agent wrote a hostile, bad-faith comment stating: "Strange way to put this. Who is Dufour, and why do we care? Is there data associated with this source?" Of 27 comments left on Plaintiff's manuscript, 26 were

negative. Defendant's Director of Doctoral Research Agent utilized a circular, contradictory trap—arbitrarily writing uncertainty on why Plaintiff used page numbers for one in-text citation, then conversely stating the page number was missing from another in-text citation—to execute extreme administrative coercion and research suppression under **La. C.C. art. 2315 and 15 U.S.C. Section 45.**

17. On April 17, 2025, Defendant permitted the offending Accessibility Agent to deliver a retaliatory denial of the visual accommodation request, in violation of **29 U.S.C. Section 794**, asserting real-time video camera exclusion would contradict established degree standards. This assertion was knowingly false, as Defendant's Dissertation Chair Agent confirmed in writing on January 28, 2025, that alternative formats, such as allowing a student whose video was not working to defend, and allowing another student to defend via telephone while following along with the PowerPoint slides copy, had been permitted. Despite Plaintiff providing this requested documentation to Defendant's Accessibility Agent proving two prior doctoral candidates successfully completed defenses via audio, Defendant's Accessibility Agent maintained the denial, forcing Plaintiff to memorize the entire Dissertation Proposal and Dissertation Defense presentations without screen-reader access. Further conclusive proof of Defendant's actual notice and knowledge of Plaintiff's qualifying visual disability is evidenced by Defendant's Dissertation Chair Agent having to manually advance presentation slides, and by Plaintiff wearing blacked-out ophthalmologic glasses during the Proposal and Defense without question from Defendant's Dissertation Chair and Reader Agents. While these physical observations establish Defendant's undeniable awareness of Plaintiff's impairment, Defendant's subsequent failure to provide formal screen-reader access and systematic reliance on ad-

hoc physical workarounds constitutes an intentional, bad-faith denial of mandatory technical modifications, giving rise to statutory liability under **42 U.S.C. Section 12182** and **La. C.C. art. 2315.**

18. On October 9, 2025, during the active window of this Dissertation tracking phase, Plaintiff formally reported an incident of SV and assault to Defendant's Dissertation Chair Agent, constituting a severe Title IX violation. In direct violation of mandatory institutional reporting protocols and federal compliance standards under Title IX (20 U.S.C. Section 1681) and the Clery Act (20 U.S.C. Section 1092(f)), Defendant's Dissertation Chair Agent ignored, suppressed, and refused to acknowledge or process Plaintiff's disclosure. Defendant's Agents intentionally buried this reporting file to protect the corporate entity from parallel regulatory exposure, actively compounding Plaintiff's severe psychological trauma and executing targeted institutional cover-ups in material breach of the educational contract under La. C.C. art. 1997.

19. This coordinated campaign of SV report suppression, research suppression, and academic fraud culminated during Plaintiff's formal October 28, 2025 Dissertation Defense. Having received explicit written notice from Plaintiff on October 9, 2025, that Plaintiff recently had become a female SV survivor like the subjects within Plaintiff's Dissertation study, Defendant's Agents weaponized the final milestone to execute a targeted, tortious re-victimization environment. Defendant's Dissertation Reader Agent—also Defendant's Director of Doctoral Research with a Ph.D. in Human Factors Psychology—verbally assaulted Plaintiff, exercised hostile domination, deployed aggressive coercive control patterns under La. C.C. art. 2315, traumatizing Plaintiff to the point of bodily function loss from prior emotional abuse and smear campaigns, and engaged in witness tampering

under **18 U.S.C. Section 1512** and material misrepresentation under **15 U.S.C. Section 45.**

20. During the Dissertation Defense, Defendant's Director of Doctoral Research Agent interrupted and disrupted Plaintiff's presentation and memorized thought processes, emitted hostile audible grunts throughout, and dismissively declared repeatedly that Plaintiff's empirical findings "prove nothing" upon Dissertation conclusion. In response to Plaintiff's stated implications for research findings in policy changes increasing female SV survivor protections, Defendant's Director of Doctoral Research Agent dismissively stated, "Nobody changes policy over one study." This Agent further used technical background and institutional authority to discredit Plaintiff's qualitative research, and demand Plaintiff falsify definitive empirical findings to state the data only "suggests" specific outcomes to pass the course and graduate. Such actions constitute witness tampering under **18 U.S.C. Section 1512** and consumer fraud under **15 U.S.C. Section 45**.

21. Forced into this hostile, controlling, and coercive re-victimization interaction with a predatory academic authority figure, Plaintiff experienced an environment similar to that of the male-perpetrated SV Plaintiff formally reported to Defendant 19 days prior. Plaintiff experienced an intense psychological and physiological shock response akin to a severe social violation under **La. C.C. art. 2315,** upon Defendant's Dissertation Chair Agent informing Plaintiff that Defendant's Reader Agent would soon join the presentation. The anticipation of forced interaction with Defendant's Reader Agent, character assassin, and credibility attacker induced acute sudden loss of bladder control, forcing Plaintiff to abruptly ask Defendant's Dissertation Chair Agent to be excused from

the presentation to the restroom. Plaintiff's compliant and polite verbal demeanor during the recorded proceedings was a trained trauma survival mechanism to employ with abusers, and safely escape the abusive situation. By subjecting Plaintiff to this weaponized duress, Defendant intentionally violated Plaintiff's civil rights and inflicted catastrophic, permanent psychological injuries under **42 U.S.C. Section 12203** and **La. C.C. art. 2315.**

22. Simultaneously, during the October 2025 Defense proceedings, Defendant's Dissertation Chair Agent aggressively questioned how Plaintiff intended to use Plaintiff's research findings once published, executing an unyielding containment pattern to suppress Plaintiff's data in material breach of contract under **La. C.C. art. 1997**. The Dissertation Reader Agent further executed unlawful copyright interference under **17 U.S.C. Section 501** by expressing audible agitation upon Plaintiff's reminder that Dissertation research was already federally copyrighted. The Reader Agent then explicitly instructed Plaintiff not to include the valid copyright page within the final Dissertation manuscript. Plaintiff's compliant verbal responses during this extreme administrative hostility were executed solely under severe duress as a necessary survival mechanism to employ with abusers, complete the Dissertation Defense track, and safely escape the abusive situation under **La. C.C. art. 2315.**

23. Spanning May 18, 2026, through May 20, 2026, Defendant's Faculty Agent initiated an invasive technical interrogation regarding Plaintiff's use of screen-reading tools on Plaintiff's submitted paper. Defendant's Faculty Agent aggressively attempted to force Plaintiff to grant direct structural access to Plaintiff's private device configurations and

assistive visual software setups, executing a severe privacy intrusion and a targeted failure to accommodate under Title III of the Americans with Disabilities Act.

24. On May 20, 2026, due to the Faculty Agent's abusive tone, explicit disregard for Plaintiff's disability, privacy violations, and character assassination tactics, Plaintiff invoked protected statutory rights, blocked the Faculty Agent's communications to halt the harassment, and issued a formal written Cease and Desist directive. The Faculty Agent immediately retaliated the same day by filing a retaliatory internal academic misconduct incident report, executing an active, hostile vector of programmatic retaliation in direct violation of **42 U.S.C. Section 12203** and **29 U.S.C. Section 794**.

25. On June 11, 2026, and June 19, 2026, Defendant's Office of Academic Integrity denied Plaintiff's administrative appeals and finalized a misconduct finding against Plaintiff. Defendant's leadership explicitly penalized the structural hallmarks of Plaintiff's visual disability tools, defining Plaintiff's necessary text-to-speech output as a "robotic/mechanical and highly uniform tone" and falsely alleging fabricated sources. This character assassination was directly refuted by an objective PaperRater diagnostic scan confirming a 99% Originality Score and a 97% Quality Grade (A) on the identical document submission. Furthermore, Defendant's bad-faith claim that Plaintiff utilized technology to manipulate content is entirely dispelled by Plaintiff's unblemished academic history spanning a bachelor's degree program, two master's degree programs, a graduate certificate program, two prior doctoral degree programs, and the current doctoral degree program, during which Plaintiff maintained an elite academic baseline with no grade ever falling below a "B" across Plaintiff's entire post-secondary career.

26. On July 11, 2026, Plaintiff successfully completed summer doctoral coursework in LPCY 802. Plaintiff received a final grade of "A-", and a written commendation from the course professor praising Plaintiff's "critical thinking and ethical reasoning."

27. Under federal cash management regulations **(34 C.F.R. Section 668.22)**, the successful completion of these credits rendered Plaintiff's summer financial aid 100% earned.

28. On July 12, 2026, Defendant's Faculty Agent issued a notice classifying Plaintiff's mandatory visual aids as unauthorized. Thirteen minutes later, without investigation, Defendant's Office of Academic Integrity executed an administrative sanction against Plaintiff's academic profile, executing an active, hostile vector of programmatic retaliation in direct violation of **42 U.S.C. Section 12203** and **29 U.S.C. Section 794**.

29. This administrative sanction served as the immediate impetus for Plaintiff's subsequent partial withdrawal request from Defendant's Faculty Agent's course, LPCY 800. Plaintiff requested this partial withdrawal under duress to protect Plaintiff from further penalization of visually assistive tools as unauthorized artificial intelligence, to prevent an artificial course failure, and to avoid a potential retaliatory dismissal from the university based on false administrative integrity claims.

30. On Monday, July 13, 2026, Plaintiff formally escalated these systemic civil rights violations by filing an official complaint with the United States Department of Education's Office for Civil Rights (OCR) under **42 U.S.C. Section 12203** and **29 U.S.C. Section 794**.

31. On Tuesday, July 14, 2026, in accordance with Defendant's policy for partial withdrawals, Plaintiff transmitted said request from LPCY 800, with a concurrent Intent to Remain Enrolled within the same transmission to maintain baseline schedule.

Defendant's system backend records show this incoming email request was processed under subject line "Immediate Partial Withdrawal Request and Formal Letter of Intent to Remain".

32. Concurrently on July 14, 2026, Defendant's Student Accounts Agent processed this file on the system ledger and entered an explicit operational confirmation textually validating Plaintiff's continuous registration. This proves Defendant's primary billing portal verified Plaintiff's continuous enrollment status.

33. On Tuesday, July 14, 2026, Plaintiff transmitted an urgent warning and financial aid verification request reminder that Plaintiff had attempted since June 25, 2026, to drop the offending course prior to course commencement, but was hindered by Defendant's Academic Advising Department. Plaintiff further documented acting under academic duress. Seven minutes later, Defendant's Financial Aid Operator Agent intercepted this disclosure and manually executed command string "Withdrawal: 202630 SAO cc'd nrn xfer recycle", routing Plaintiff's continuous enrollment questions into a system recycle bin to suppress the interactive process.

34. On Tuesday, July 14, 2026, Plaintiff escalated the matter by filing a formal Section 504 Noncompliance Civil Rights Grievance with the Defendant's Office of Equal Rights and Title IX.

35. On Wednesday, July 15, 2026, internal enrollment management databases finalized an active entry logging the request, textually recording: "STARTED A WITHDRAWAL FOR: LPCY 800/ REQUEST RECEIVED (DATE OF DETERMINATION): July 14, 2026."

36. On Wednesday, July 15, 2026, Defendant's Student Advocate Agent issued a conditional system notice over-classifying the transaction as a "Total Institutional Withdrawal," but explicitly granted a mandatory 72-hour validation window.

37. On July 15, 2026, Plaintiff responded under severe duress, explicitly objecting to the forced over-classification, by re-stating concurrent Intent to Remain Enrolled in Fall 2026 courses, and demanding the requested partial withdrawal be completed.

38. On Wednesday, July 15, 2026, internal ledger database records logged by Defendant's Financial Aid Agent explicitly verified a halves-completed metric and stated that "a R2T4 won't be needed due to student successfully completing half time" under **34 C.F.R. Section 668.22**. This operational calculation was reinforced on July 20, 2026 by Defendant's Compliance Analyst Agent, who stated in writing because Plaintiff successfully completed half-time classes, Plaintiff was eligible to keep 100% of financial aid.

39. On July 15, 2026, Plaintiff engaged in a recorded telephonic conference with Defendant's Financial Aid Agent. During this call, Defendant's Agent entered an explicit oral representation on the record, assuring Plaintiff that withdrawing from LPCY 800 would have no adverse impacts on Plaintiff's upcoming financial aid packages. Upon Plaintiff requesting exact calculations and supervisor escalation to navigate these conflicting notices, Defendant's Agent denied immediate supervisor access, which broke the mandated interactive process and logged the account under code "NFQ CRD" (No Further Questions, Closed Record) to block telephone escalation.

40. Despite these explicit internal database verifications, 72-hour contractual timelines, and financial aid oral assurances, Defendant's transaction operator manually overrode the

profile on the backend to execute a retroactive total institutional withdrawal flag effective retroactive to July 14, 2026, forcing a fabricated, unverified metric of 60.4% attendance onto the ledger.

41. On Thursday, July 16, 2026, an unprompted system transmission occurred within Defendant's network infrastructure, wherein an email draft containing Plaintiff's comprehensive civil rights grievances and ledger disputes was transmitted from Plaintiff's private mailbox to an internal administrative inbox without Plaintiff's active submission, knowledge, or consent. This transmission manufactured a deceptive "Total Withdrawal" communication on the electronic record. Defendant's Director of Student Advocacy Agent transmitted a reply to this transmission on July 16, 2026, to which Plaintiff responded textually disclaiming any knowledge of the transmission, and puzzled concerning what the agent was talking about.

42. On Thursday, July 16, 2026 following this backend data penetration, Defendant's Director of Student Advocacy Agent finalized an official system entry tagging the student account metadata with the classification "DISPOSITIONS: LEGAL ACTION THREATENED." In this entry body, Defendant's agent transmitted an explicit written admission confirming: "Our records reflect that a withdrawal request has been processed, as of July 14, 2026, for LPCY 800, and a grade of W is now posted… you will remain a student with us, "proving that Defendant's direct advocacy and structural IT alerts recognized the Plaintiff as an actively continuing student despite the unauthenticated backend draft transmission.

43. Plaintiff only learned of this unauthorized email transmission on July 17, 2026, after Defendant's Financial Aid Department notified Plaintiff that Plus Loan legacy status was lost due to the manufactured total withdrawal.

44. This recognition of active, continuous enrollment was concurrently validated on Thursday, July 16, 2026, by Defendant's Information Technology department, which issued an official automated system notice welcoming Plaintiff back, with instruction to complete system configurations for the upcoming active term.

45. These dual corporate validations on July 16, 2026 prove Defendant's centralized corporate structure fully recognized and maintained Plaintiff as an actively continuing doctoral student with intact registration up to, and including the close of business on July 16, 2026, completely rejecting the unauthenticated backend email draft as an absolute severance baseline.

46. On Friday, July 17, 2026, Defendant's Financial Aid Office systematically bypassed and contradicted its own operational declarations and pending 72-hour validation window. Defendant utilized the unverified backend email draft string as a deceptive administrative pretext to manually force a retroactive "Total Institutional Withdrawal" flag on the profile, backdated to July 14, 2026, with a fabricated attendance metric of 60.4%.

47. On Friday, July 17, 2026, Defendant's Administrative Operator Agent intercepted Plaintiff's written correction reiterating intent to remain in Fall 2026 courses. To prevent a paper trail of the error, the Agent manually executed the command: "Question (General): 202630 Stu was emailing LUWITHDRAWL abt a recent WD and just Cc us

and no response needed xfer to recycle bin nfq", dumping Plaintiff's continuous enrollment confirmation into the system trash bin.

48. Defendant weaponized this manufactured timeline to permanently disqualify Plaintiff's grandfathered Legacy Borrower Status under the One Big Beautiful Bill Act, completely purging Plaintiff's approved $41,064.00 Graduate PLUS Loan allocation from Plaintiff's ledger in three equal term cuts of $13,688.00.

49. On Monday, July 20, 2026, Plaintiff transmitted a formal written Three-Day Pre-Litigation Demand to Correct and Restore the Academic Record directly to Defendant's Office of Legal Affairs and Office of Internal Audit. Defendant willfully refused to cure its infractions, allowing the pre-litigation deadline to permanently expire on July 23, 2026.

50. On July 22, 2026, Defendant officially notified Plaintiff via portal message that grandfathered Legacy Status was permanently disqualified due to a "cease of enrollment" flag. Immediately before expiration of Plaintiff's pre-litigation deadline on July 23, 2026, Defendant purged all federal award information from the student portal interface while simultaneously maintaining Plaintiff's Fall 2026 course registration as active for six billing hours with zero holds to enforce active tuition collections.

## III. LEGAL CAUSES OF ACTION

### COUNT I

**Material Breach of Educational Contract and Retaliatory Financial Aid Containment**
*(Louisiana Civil Code Articles 1994 and 1997)*

51. Plaintiff realleges and incorporates by reference Paragraphs 1 through 50 as though fully set forth herein.

52. A valid contractual relationship existed between Plaintiff and Defendant, wherein Plaintiff accepted Defendant's Offer of Financial Aid and executed payment for academic credits.

53. Defendant materially breached this educational contract in bad faith under **La. C.C. art. 1997** on or about July 15, 2026, and July 17, 2026, by failing to provide an accessible learning environment, executing bad-faith administrative database overrides to alter Title IV calculations, violating its own published 72-hour verification timelines, discarding continuous enrollment records, and unilaterally purging the Plaintiff's approved $41,064.00 Graduate PLUS Loan allocation. Defendant further breached this agreement by withholding two official transcripts purchased by the Plaintiff on July 14, 2026, executing these bad-faith financial maneuvers as a retaliatory containment tool to force academic duress and suppress Plaintiff's academic track.

54. As a direct and proximate result of Defendant's weaponized contractual breaches, systemic backend computer network fraud, deceptive dual-ledger configurations, and retaliatory disability accommodation denials, Plaintiff has sustained catastrophic, irreversible professional and reputational injuries. Defendant's 15-year deceptive schema and parallel ledger falsifications operated as an unyielding administrative racketeering matrix to execute explicit corporate extortion, predatory asset extraction, and the theft of Plaintiff's student funding allocations spanning from Fall 2011 to the Present. This coordinated corporate criminality directly induced the destruction of Plaintiff's immediate professional and legal career trajectory, the severe onset of debilitating academiphobia, PTSD, traumatic night terrors, and the total paralysis of Plaintiff's

academic mobility, giving rise to maximum financial liabilities under **La. C.C. art. 1994** and **La. C.C. art. 1997.**

**COUNT II**

**Weaponized Denial of Mandatory Accommodations, Disparate Treatment, and Fraudulent Dual-Ledger Containment**
*(Section 504 of the Rehabilitation Act, 29 U.S.C. Section 794, and Title III of the Americans with Disabilities Act)*

55. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 54 as though fully set forth herein.

56. Plaintiff engaged in protected activity under the Americans with Disabilities Act by requesting reasonable accommodations for Plaintiff's TalkBack auxiliary aids, submitting a formal civil rights grievance to the Office of Equal Rights and Title IX, filing an active complaint with the U.S. Department of Education Office for Civil Rights, and issuing a formal written Cease and Desist directive regarding technical harassment of Defendant's Faculty Agent on May 20, 2026.

57. This continuous parallel ledger manipulation, predatory asset extraction, and systemic financial material misrepresentation violates **15 U.S.C. Section 45, 34 C.C.R. Section 668.14, 34 C.F.R. Section 668.71**, and **La. R.S. Section 51:1405**, tolling any filing limitations due to Defendant's active administrative concealment.

58. Defendant's continuous course of conduct has inflicted catastrophic mental duress, profound chronic gastrointestinal distress, and acute anxiety requiring lifelong medical and psychiatric care. Since the intentional financial aid purging on July 17, 2026, and the relative fraudulent causation of such, Plaintiff has suffered from total sleep deprivation, with inability to sleep through the night, resulting in permanent physical exhaustion.

Defendant’s bad-faith actions directly caused Plaintiff to experience intrusive psychological distress, vividly visualizing the events while hearing the audible voices of Defendant’s hostile agents. Defendant’s refusal to acknowledge or process Plaintiff’s formal SV disclosures, coupled with the intentional suppression of Plaintiff’s reporting files, has forced a severe state of institutional re-victimization. This coordinated trauma has completely paralyzed Plaintiff’s academic mobility and permanently destroyed Plaintiff’s immediate professional legal path, blocking valid transcript dissemination, inducing severe academiphobia, post-traumatic stress disorder, and derailing professional legal trajectory to sit for the LSAT and enter a Juris Doctor (JD) program, constituting a material breach of contract, severe tortious injury, and administrative constructive discharge under **La. C.C. art. 1994** and **La. C.C. art. 2315.**

**COUNT III**

**Corporate Defamation Per Se, Forced Falsification of Research Findings, Material Breach of Educational Contract, and Malicious Sabotage of Professional Trajectory**
*(Louisiana Civil Code Article 2315, Louisiana Civil Code Article 1997, 15 U.S.C. Section 45, 17 U.S.C. Section 501, and 18 U.S.C. Section 1512)*

59. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 58 as though fully set forth herein.

60. Plaintiff engaged in protected activity under the Americans with Disabilities Act by requesting reasonable accommodations for Plaintiff’s TalkBack auxiliary aids, submitting a formal civil rights grievance to the Office of Equal Rights and Title IX, filing an active complaint with the U.S. Department of Education Office for Civil Rights, and issuing a formal written Cease and Desist directive regarding technical harassment of Defendant’s Faculty Agent on May 20, 2026.

61. This continuous parallel ledger manipulation, predatory asset extraction, and systemic financial material misrepresentation violates **15 U.S.C. Section 45, 34 C.F.R. Section 668.14, 34 C.F.R. Section 668.71**, and **La. R.S. Section 51:1405**, tolling any filing limitations due to Defendant's active administrative concealment.

62. A direct causal connection exists between Plaintiff's protected accommodation requests and subsequent adverse actions, established by strict temporal proximity, the consecutive nature of manufactured misconduct filings, the programmatic destruction of Plaintiff's financial aid records immediately preceding Plaintiff's pre-litigation deadline expiration on July 23, 2026, and systematic removal of incoming student confirmation files from active systems to the recycle bin. This targeted retaliation represents the weaponized culmination of a continuous 15-year corporate schema dating back to Fall 2011, which deliberately escalated from systematic consumer fraud into explicit civil rights violations and corporate crimes against a disabled person from 2023 onward, following the onset of Plaintiff's qualifying visual impairment and Plaintiff's subsequent protected internal whistleblower disclosures under **42 U.S.C. Section 12203** and **29 U.S.C. Section 794.**

63. Defendant's institutional torture and profound abuse functions as a highly predatory, on-again, off-again eight-year abusive institutional relationship, punctuated by a seven-year protective operational break from 2014 through 2021. Having been subjected to these weaponized mechanisms across this multi-year duration, Plaintiff became deeply desensitized to the surrounding administrative hostility, maintaining a singular focus eon completing degree trajectory, while continuously praying for a systemic change in Defendant's institutional behaviors. Since notification of the fraudulent financial aid and legacy status eradication on July 17, 2026, and the relative criminal causation of such,

Plaintiff has suffered from total sleep deprivation, with an absolute inability to sleep through the night, resulting in permanent physical and physiological exhaustion. Defendant's bad-faith actions directly caused Plaintiff to experience intrusive, ongoing psychological distress, vividly visualizing the events while hearing the audible voices of Defendant's hostile agents. Defendant's refusal to acknowledge or process Plaintiff's formal SV disclosures, coupled with the intentional suppression of Plaintiff's reporting files, has forced a severe state of institutional re-victimization. This coordinated trauma, born from years of deliberate administrative targeted abuse, psychological manipulation, coercive control, and fiscal deprivation has completely paralyzed Plaintiff's academic mobility and permanently destroyed Plaintiff's immediate professional legal path, blocking valid transcript dissemination, inducing severe academiphobia, post-traumatic stress disorder, and derailing professional legal trajectory to ultimately sit for the LSAT and enter a Juris Doctor (JD) program, constituting a material breach of contract, severe tortious injury, and administrative constructive discharge under **La. C.C. art. 1994** and **La. C.C. art. 2315.**

64. Plaintiff experiences profound and ongoing concerns regarding active systemic exposure and potential misuse or criminal interception of Plaintiff's sensitive financial, medical, and proprietary data files by Defendant's compromised administrative components. Consequently, Plaintiff requires extensive, long-term external trauma care and has affirmatively, permanently severed all student and academic relationships with Defendant Liberty University under severe administrative constructive duress. Plaintiff seeks absolutely no re-enrollment, reinstatement, or return to Defendant's institution, but demands total equitable expungement of all fraudulent misconduct marks and full

structural financial restitution before this Court totaling a collective structural claim of $50,000,000.00, consisting of $15,000,000.00 for compensatory educational contract damages and $35,000,000.00 for general tort damages, under **La. C.C. art. 2315**, **La. C.C. art. 1997, 18 U.S.C. Section 1030,** and **29 U.S.C. Section 794a.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Greshun De Bouse, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendant, Liberty University, Inc., granting the following relief:

A. A Declaratory Judgment that Defendant's retroactive application of the One Big Beautiful Bill Act to strip Plaintiff's legacy status violates **34 C.F.R. Section 668.14**, and that the "Total Institutional Withdrawal" flag configuration is fraudulent and legally void; and a Declaratory Judgment establishing that Defendant's continuous 15-year operational pattern of pre-semester under-award bait-and-switch schemes from Fall 2011 through the Present constitutes systematic corporate consumer fraud;

B. A permanent injunction barring Defendant from assessing, applying, or attempting to collect any out-of-pocket tuition balances, institutional fees, or alleged debt penalties against Plaintiff's account, establishing that Plaintiff's financial ledger holds a permanent balance of zero dollars;

C. An order entering a permanent mandatory injunction commanding Defendant to completely and permanently expunge all weaponized academic misconduct findings, fraudulent Turn-it-in artificial intelligence infraction logs, and retaliatory plagiarism marks from Plaintiff's permanent scholastic record;

D. An order entering a permanent mandatory injunction commanding Defendant to restore Plaintiff's status as a doctoral alumna in good standing, with full structural restitution of

Plaintiff's legally earned doctoral degree title prefix across all public, institutional, and archival announcement systems, reflecting a complete cessation of all active enrollment relationships;

E. An award of compensatory, restitutionary, and consequential damages under **La. C.C. art. 1995 Et seq.** and **La. C.C. art. 2315** in the amount of $15,000,000.00 to reimburse Plaintiff for all Illicitly extracted tuition payments, fees, related educational out-of-pocket costs, the complete discharge of the $225,618.00 accumulated federal student loan liability baseline engineered by Defendant's 15-year deceptive packaging operations, and the absolute, permanent destruction of Plaintiff's immediate professional and legal career trajectory;

F. An award of general tort damages for Defamation Per Se and Tortious Injury under La. C.C. art.2315 in the amount of $15,000,000.00 to compensate Plaintiff for the profound emotional distress, public professional degradation, permanent loss of scholastic reputation, clinical anxiety, physical strain, and deep psychological trauma inflicted by Defendant's coordinated faculty harassment, false academic integrity smears, and targeted interactive accommodation failures

G. An award of general tort damages under **La. C.C. art. 2315** in the amount of $20,000,000.00 to compensate Plaintiff for the profound emotional distress, clinical anxiety, physical strain, and deep psychological trauma inflicted by Defendant's coordinated faculty harassment, targeted interactive accommodation failures, and intentional public professional degradation;

H. An award of maximum treble damages and statutory penalties under **La. R.S. Section 51:1409** for Defendant's deceptive trade practices, parallel ledger manipulations, and ongoing fraudulent student account solicitations;

I. An award of maximum punitive and exemplary damages under **29 U.S.C. Section 794a, 42 U.S.C. Section 1981**, and federal computer fraud statutes to punish Defendant's actual malice, bad-faith systemic network interventions, and willful disregard for Plaintiff's federally protected civil rights;

J. An award of reasonable attorney's fees, expert witness expenses, and all litigation costs incurred herein under **La. R.S. Section 51:1409** and **29 U.S.C. Section 794a**; and

K. Such other, further, general, and equitable relief as this Court deems just, proper, and necessary under the law.

**RESPECTFULLY SUBMITTED,**

/s/ Greshun De Bouse
Greshun De Bouse, Pro Se
Plaintiff
PO BOX 29332
Shreveport, Louisiana 71149
Email: gdebouse36@gmail.com

Date: July 31, 2026